# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) |
| | )    Bankruptcy No. 04 B 02392 |
| JOSEPH T. HAUGHEY and | )    Chapter 7 |
| SHANNON L. HAUGHEY, | )    Judge John H. Squires |
| | ) |
| Debtors. | ) |
| | ) |
| PAVEMENT MAINTENANCE, INC. | ) |
| and THOMAS V. MURRAY, | )    Adv. No. 04 A 02264 |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JOSEPH T. HAUGHEY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by Pavement Maintenance, Inc. and Thomas V. Murray (collectively the "Plaintiffs" and individually "PMI" and "Murray") against Joseph T. Haughey (the "Debtor"), which seeks to except from discharge a debt owed by the Debtor to PMI pursuant to 11 U.S.C. § 523(a)(4). For the reasons set forth herein, the Court grants judgment in favor of PMI in the sum of $85,910.00 and finds that the debt is non-dischargeable under § 523(a)(4).

-2-

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. FACTS AND BACKGROUND

Many of the facts are not in dispute. At all relevant times, PMI was an Illinois corporation that was formed in 1993 by Murray and the Debtor for the purpose of providing trucking services to the asphalt pavement construction industry in the Chicago area. Trial Tr. at 9, 14, and 17-18. Murray was the president, a director, and a 50% shareholder of PMI. *Id.* at 10-11 and 45-46; Plaintiffs' Group Ex. No. 1. At all relevant times, the Debtor was the secretary, a director, and the other 50% shareholder of PMI. Trial Tr. at 9-11 and 46; Plaintiffs' Group Ex. No. 1. Murray and the Debtor were the sole officers, directors, and sharcholders of PMI. Trial Tr. at 10-11; Plaintiffs' Group Ex. No. 1.

The Debtor worked in the construction industry prior to forming PMI with Murray. Trial Tr. at 14. Specifically, the Debtor worked for Accu-Paving from 1988 through 1993. *Id.* at 14-15. In addition, the Debtor had taken a few courses in construction-related subjects at a community college. *Id.* at 15. Murray had no experience in the construction industry prior to forming PMI with the Debtor. *Id.* at 44.

Murray contributed personal funds to PMI so that the corporation could purchase a dump truck. *Id.* at 17-19 and 48-49. In addition, Murray obtained a $50,000.00 loan for PMI which he secured with his personal assets. *Id.* at 48. The Debtor did not provide any capital

-3-

to PMI at its inception. *Id.* at 17 and 49. Rather, his contributions to PMI were the services

he provided in the operations of the company–driving the dump truck and soliciting sales.

*Id.* at 18-19.

The Debtor testified that he was the general manager of PMI and responsible for the

day-to-day operations of the company. *Id.* at 22. During the first year of PMI's existence,

Murray's function with respect to the company was primarily financial. *Id.* at 19 and 47.

From January 1999 to the present, Murray was the president of Chicago Wicker and

Trading Company ("Chicago Wicker"), which was located in the same offices as PMI

through 2002. *Id.* at 44-45 and 84. In 1996, Murray moved to New York after accepting a

job transfer from his full-time employer. *Id.* at 50. Murray's move did not affect PMI's

operations because the Debtor was performing the day-to-day operations. *Id.* at 50-51. In

August of 1998, Murray moved back to Chicago. *Id.* at 51-52. At that time, he became

responsible for overseeing PMI's office staff, including payroll and accounts payable. *Id.* at

24-25, 50, and 52-53. The Debtor's responsibilities changed from 1998 to 2002 after Murray

moved back to Chicago. *Id.* at 23-24. The Debtor testified that he had less responsibility in

the office and was more involved with PMI's sales, job bid process, and receivables

collection. *Id.*

In 1997, PMI expanded its business to include asphalt pavement contracting. *Id.* at

19-21 and 52. The asphalt paving business is a seasonal operation, beginning in late March

and ending in early December. *Id.* at 21. Murray obtained a $150,000.00 line of credit to

finance this expansion of the business. *Id.* at 53.

-4-

In 2000, PMI opened a checking account with MB Financial Bank, N.A. ("MB Financial"). *Id.* at 27-28. The Debtor had authority to issue checks on PMI's checking account. *Id.* at 28. In addition, he had knowledge of and access to PMI's accounting software. *Id.* at 27.

In 2001, PMI sustained a substantial loss. *Id.* at 63-64. After Murray and the Debtor discussed the viability of PMI between the 2001 and 2002 seasons, Murray borrowed $100,000.00 from his parents to finance PMI's operations for the 2002 construction season, and PMI obtained a $250,000.00 loan which Murray helped secure with his personal assets. *Id.* at 60-61. Both Murray and the Debtor executed personal guarantees for PMI's loans from MB Financial, loans which were in excess of $700,000.00 by the end of 2002. *Id.* at 80. According to Murray, both he and the Debtor personally borrowed money and put it into PMI. *Id.* at 64.

PMI's 2002 season was not profitable. *Id.* at 64-65. The company began to bounce checks from its MB Financial account. *Id.* at 66. Murray testified that he and the Debtor met about this problem and decided that they needed to get control over the checking account. *Id.* at 66-69. Murray further testified that he and the Debtor agreed that all checks should be issued through the office rather than having either him or the Debtor writing checks outside of the office. *Id.* at 66 and 68-69.

Murray and the Debtor testified about what happened when PMI's checks were returned by MB Financial for insufficient funds. *Id.* at 100-103 and 111-114. They both stated that in order to satisfy the affected payee who received an NSF check, they would make a PMI check payable to "cash" and either use that check to purchase a cashier's check

·5·

or procure the cash from MB Financial. *Id.* They testified that such a process was necessary because employees or vendors receiving NSF checks would typically not accept another PMI check. *Id.* Murray testified that when he made checks payable to "cash" for the purpose of obtaining cashier's checks or cash, it was his policy and practice to place a note in the memo portion of the check documenting the party for whom the funds from the check were intended to be paid. *Id.* at 106-107.

On May 23, 2002, the Debtor issued a check on PMI's checking account made payable to "cash" in the amount of $2,100.00. Plaintiffs' Ex. No. 2; Trial Tr. at 29. The Debtor could not specifically recall the purpose of this check. Trial Tr. at 29 and 110. In August 2002, the Debtor and Murray again met and discussed the need for the Debtor to not write any more checks on PMI's account outside of the office. *Id.* at 68-69. The Debtor agreed. *Id.* at 69. However, he did not stop writing checks on PMI's account outside of the office. *Id.* at 70. On October 11, 2002, the Debtor issued a check on PMI's checking account made payable to "cash" in the amount of $8,500.00. Plaintiffs' Ex. No. 3; Trial Tr. at 32. The Debtor could not specifically recall the purpose of this check. Trial Tr. at 32 and 110.

On October 12, 2002, the Debtor issued a check on PMI's account made payable to "Legacy Paving" in the amount of $25,000.00. Plaintiffs' Ex. No. 3; Trial Tr. at 30-31. Legacy Paving was not one of PMI's vendors, nor did PMI owe money to Legacy Paving. Trial Tr. at 30-31 and 73. The Debtor testified that the check issued to Legacy Paving was for partial repayment of a loan to PMI from a colleague, Tony Sanchez. *Id.* at 31. The Debtor further testified that he thought that Legacy Paving is owned by Rego Sanchez, who

·6·

he thought is Tony Sanchez's brother. *Id.* at 116. According to the Debtor, Tony Sanchez

obtained $50,000.00 from his brother, Rego Sanchez, to loan to PMI. *Id.* at 117. The Debtor

stated that when he wrote the check to Legacy Paving, he understood that he was repaying

part of that loan. *Id.*

Murray, on the other hand, testified that Tony Sanchez loaned the money to the

Debtor personally, not to PMI. *Id.* at 88. Murray testified about a meeting that he had with

the Debtor and Tony Sanchez in May 2002. *Id.* at 73-74. According to Murray, he and the

Debtor were looking for more capital to infuse into PMI, as well as for a partner. *Id.* at 73.

Murray stated that Sanchez, however, was not interested in a partnership. *Id.* Rather, he was

willing to loan PMI money. *Id.* Murray further testified that after the meeting, he and the

Debtor discussed Sanchez's offer to loan PMI money. *Id.* at 74. Murray stated that he was

not comfortable with Sanchez loaning money directly to PMI. *Id.* Instead, according to

Murray, the Debtor decided to personally borrow the money from Sanchez and loan it to

PMI. *Id.* The check that PMI received from Tony Sanchez as a result of the loan was made

payable to "PMI," but "Loan - Joe" was written on the memo line. Debtor's Ex. A; Trial Tr.

at 88. Murray endorsed this check and deposited it into PMI's account. Trial Tr. at 88.

On December 13, 2002, the Debtor issued a check on PMI's account payable to

"cash" in the sum of $7,780.00. Plaintiffs' Ex. No. 4; Trial Tr. at 32-33. The Debtor could

not specifically recall the purpose of this check. Trial Tr. at 33 and 110. On January 10,

2003, the Debtor issued a check on PMI's checking account made payable to "cash" in the

amount of $8,530.00. Plaintiffs' Ex. No. 5; Trial Tr. at 33-34. The Debtor could not

specifically recall the purpose of this check. Trial Tr. at 34 and 110. On January 17, 2003,

-7-

the Debtor issued another check on PMI's checking account made payable to "cash" in the sum of $4,000.00. Plaintiffs' Ex. No. 5; Trial Tr. at 34-35. Once again, the Debtor could not specifically recall the purpose of this check. Trial Tr. at 35 and 110.

PMI's 2002 season ended in November of that year. *Id.* at 71. Both Murray and the Debtor attempted to collect PMI's receivables which then aggregated over $1,000,000.00. *Id.* On December 26, 2002, T & B Limited issued a check payable to "PMI" in the amount of $15,000.00, and T & B Limited Partnership issued a check payable to "PMI" in the amount of $15,000.00. Plaintiffs' Ex. No. 6. There was a notation below copies of these checks in the record which stated: "[a]s per Michael A. Tadin Sr. Deducted from PMI." *Id.* Murray testified that Michael A. Tadin, Sr. ("Tadin") is the owner and president of MAT Leasing, Inc. ("MAT") and that he thought that Tadin is also the president of T & B Limited. Trial Tr. at 79. At the end of PMI's 2002 season, MAT owed PMI approximately $236,000.00. *Id.* at 76 and 79. PMI attempted to collect this receivable from MAT. *Id.* Murray testified that after December 26, 2002, the date on which the two T & B checks were written, the Debtor informed Murray that he had successfully collected some of PMI's receivables from MAT. *Id.* at 79. The Debtor admittedly did not deposit these T & B checks into PMI's checking account and could not specifically recall if he ever received the checks. *Id.* at 35-37 and 41. Murray testified that these checks were never deposited into PMI's checking account. *Id.* at 76. Moreover, Murray stated that the Debtor had testified on deposition that those checks were personal loans to him from Tadin. *Id.* at 79.

-8-

After December 31, 2002, PMI ceased all operations and no longer employed any laborers. Joint Pretrial Statement at p. 4. The Debtor began working for Sanchez Construction Services, Inc. in 2003. Answer at ¶ 10.

On January 22, 2004, the Debtor and his wife filed a voluntary Chapter 7 petition. On April 22, 2004, the Plaintiffs filed the instant adversary proceeding against only the Debtor. Pursuant to the two-count complaint, the Plaintiffs seek a finding that the debt owed by the Debtor to PMI is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) and § 523(a)(6).[1] In addition, the Plaintiffs request the entry of a judgment in favor of PMI and Murray and against the Debtor.[2] Specifically, the Plaintiffs maintain that the Debtor failed to account for the following funds: (1) the aggregate sum of $30,910.00 that he received as a result of the checks he issued on PMI's checking account made payable to "cash"; (2) $25,000.00 for the Legacy Paving check that he failed to deposit into PMI's account; and (3) $30,000.00 for the $15,000.00 T & B Limited and the $15,000.00 T & B Limited Partnership checks that he failed to deposit into PMI's account. The Plaintiffs request that the Court

[1] The Court granted the Plaintiffs' motion to dismiss Count II of the complaint which is based on § 523(a)(6). Trial Tr. at 2. Accordingly, only Count I of the complaint remains.

[2] A creditor may liquidate a debt and establish the debt's non-dischargeability, thereby killing two birds with one stone. *See, e.g., Cohen v. de la Cruz*, 523 U.S. 213 (1998); *In re Bero*, 110 F.3d 462 (7th Cir. 1997).

-9-

enter a judgment in the sum of $85,910.00[3] in favor of PMI and find the debt non-dischargeable pursuant to § 523(a)(4). The Debtor denies that he failed to account for any monies owed to PMI or that he wrongfully received any funds that were due to PMI.[4]

## III. DISCUSSION

### A. Exception to the Discharge of a Debt

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *In re Harasymiw*, 895 F.2d 1170, 1172 (7th Cir. 1990); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 961 (Bankr. N.D. Ill. 1995). The United States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor in order to further the policy of providing the debtor with a fresh start in

---

[3] The Plaintiffs did not quantify this figure in their complaint. Rather, in their post-trial written closing statement, the Plaintiffs request that the Court enter a money judgment in favor of PMI and against the Debtor in this amount.

[4] The Debtor sets forth two affirmative defenses summarized briefly as follows:

(1) Murray devoted less than 25% of his time to the operation of PMI and used over 75% of PMI's office employees to conduct his Chicago Wicker business, which was unrelated to PMI's business. This was the cause of PMI's inability to sustain its asphalt construction pavement business.

(2) In November 2002, PMI, through Murray and the Debtor, assigned its receivables to Tony Sanchez in partial repayment of the loan he made to PMI. The Debtor went to work for Sanchez Construction Services, Inc. shortly thereafter. While in its employ, the Debtor attempted to collect PMI's receivables and deposited those amounts into PMI's operating account.

The Court addresses these affirmative defenses *infra*.

·10·

bankruptcy. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998); *Goldberg Secs. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). "The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

**B.  11 U.S.C. § 523(a)(4)**

Section 523(a)(4) of the Bankruptcy Code provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4). The meaning of these terms is a question of federal law. *In re McGee*, 353 F.3d 537, 540 (7th Cir. 2003). In order for the Plaintiffs to prevail under § 523(a)(4), they must prove that the Debtor committed (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement; or (3) larceny. *See* 11 U.S.C. § 523(a)(4). The Plaintiffs do not specifically allege embezzlement or larceny in their complaint.[5] Rather, they contend that the Debtor's actions constitute fraud or defalcation while acting in a fiduciary capacity and that their damages were caused as a result of the Debtor's conversion, misappropriation, and failure to account for corporate assets.

**1.  Express Trust or Fiduciary Relationship**

A threshold inquiry is whether an express trust or fiduciary obligation runs from the Debtor to the Plaintiffs under the facts of this matter. The existence of an express trust or

---

[5]  Thus, the Debtor's arguments with respect to these prongs of § 523(a)(4) are inapposite and will not be further addressed by the Court.

-11-

fiduciary relationship is tested under federal law standards. *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000). An express trust requires an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 358 (Bankr. N.D. Ill. 2004). The evidence before the Court fails to show, and the Plaintiffs do not argue, that an express trust was created or intended.

However, a § 523(a)(4) cause of action can be based on a fiduciary relationship other than one arising from an express trust. *See Frain*, 230 F.3d at 1017; *In re Marchiando*, 13 F.3d 1111, 1115-16 (7th Cir. 1994). "A fiduciary relationship may arise separate from an express trust . . . but it is the substance and character of the debt relationship that determines whether such a fiduciary relationship exists." *Monroe*, 304 B.R. at 358. The Seventh Circuit has found that a fiduciary relationship exists for purposes of § 523(a)(4) when there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Marchiando*, 13 F.3d at 1116. *See also In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996) ("[S]ection 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge. . . ."). For example, a lawyer-client relationship, a director-shareholder relationship, and a managing partner-limited partner relationship all require the principal to "'repose a special confidence in the fiduciary.'" *Frain*, 230 F.3d at 1017 (*quoting Marchiando*, 13 F.3d at 1116).

However, not all fiduciary relationships fall within the purview of § 523(a)(4). *Woldman*, 92 F.3d at 547. A fiduciary relation qualifies under § 523(a)(4) only if it "imposes real duties in advance of the breach. . . ." *Marchiando*, 13 F.3d at 1116. In other words, the fiduciary's obligation must exist prior to the alleged wrongdoing. *Id.*

-12-

A corporate officer can be a fiduciary under § 523(a)(4), but that determination requires the Court to make a factual analysis of the corporation's structure and operations. *See, e.g., Frain*, 230 F.3d at 1017. Whether a corporate officer owes a fiduciary duty to a corporation is determined by the law of the state of incorporation. *Treco, Inc. v. Land of Lincoln Savs. & Loan*, 749 F.2d 374, 377 (7th Cir. 1984). PMI, at all relevant times, was an Illinois corporation. Thus, Illinois law applies here.

Under Illinois law, corporate officers and directors occupy a fiduciary relationship with respect to their corporation and shareholders. *Technic Eng'g, Ltd. v. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1010 (N.D. Ill. 1999); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 257 B.R. 253, 274 (Bankr. N.D. Ill. 2001); *Brown v. Tenney*, 532 N.E.2d 230, 235 (Ill. 1988). Corporate officers and directors are fiduciaries of the corporation; have duties of good faith, loyalty, and honesty; and may not enhance their personal interests at the expense of the corporation's interests. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 354 (Bankr. N.D. Ill. 2001); *Anest v. Audino*, 773 N.E.2d 202, 209 (Ill. Ct. App. 2002); *Dowell v. Bitner*, 652 N.E.2d 1372, 1379 (Ill. Ct. App. 1995). An officer or director of a corporation is forbidden from administering the affairs of the corporation for his private emolument and cannot deal with corporate property, either directly or indirectly, for his own benefit. *Gidwitz v. Lanzit Corrugated Box Co.*, 170 N.E.2d 131, 137 (Ill. 1960). A corporate officer's conversion of corporate funds is a breach of his fiduciary duty to the corporation. *TMF Tool Co. v. Siebengartner*, 899 F.2d 584, 589 (7th Cir. 1990). Additionally, a corporate officer's use of corporate funds to pay a personal debt is a breach of his fiduciary duty to the corporation. *Id.*

-13·

The Court finds that the Debtor owed a pre-existing fiduciary duty to PMI as a result of his status as an officer and director of PMI before any of the subject checks were issued or presented. However, it is a different story with respect to the duty owed by the Debtor to Murray. Generally, a director owes no fiduciary duty to an officer of a corporation. *Pope v. Crandall*, No. 93 C 3061, 1994 WL 55731, at *3 (N.D. Ill. Feb. 22, 1994). Corporate officers and directors owe a fiduciary duty only to the corporation and its shareholders. *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 829 N.E.2d 818, 828 (Ill. Ct. App. 2005). Thus, the Court finds that the Debtor did not owe a fiduciary duty to Murray, a fellow officer and director.

The Court rejects the Plaintiffs' argument that there was substantial inequality in power or knowledge between Murray and the Debtor at the times of the transactions at bar. The mere fact that the Debtor had worked in the asphalt paving industry prior to forming PMI with Murray in 1993 did not place him in a position of substantial power over Murray in 2002. Even if the Debtor had superior knowledge of the industry by virtue of his past work experience or because he operated PMI on a daily basis, this knowledge is not sufficient in and of itself to establish a position of ascendancy. *See Frain*, 230 F.3d at 1017. Moreover, Murray's status as primarily a financial partner from 1993 through 1998 does not mean that the Debtor held a position of control over him when the alleged fraud and defalcation occurred in 2002. After all, Murray came back to Chicago in 1997 and began working in PMI's office on a regular basis. The Plaintiffs failed to show that the Debtor was in a position of ascendancy over Murray. Accordingly, the Court finds that the concentration in power between the Debtor and Murray was not substantially one-sided in 2002.

-14-

Further, the Court rejects the Plaintiffs' contention that the Debtor had a life-and-death power over PMI as a going concern and exercised that power at the end of PMI's 2002 season when he went to work for one of PMI's competitors. Murray testified that he and the Debtor discussed the viability of PMI at the end of the 2002 season and that it was clear to Murray at that point that PMI would not survive another season. Trial Tr. at 67-70. Thus, it was not the Debtor's act of taking new employment that resulted in the demise of PMI. Rather, the company had been struggling and failing for several years prior to the Debtor's departure.

The Court concludes that the Debtor did not owe a fiduciary duty to Murray, another officer and director of PMI, prior to the Debtor's alleged wrongdoing. Rather, the Debtor was at all relevant times a fiduciary with respect to only PMI. Consequently, the Court finds that Murray may not sustain a cause of action against the Debtor pursuant to § 523(a)(4).

## 2. Defalcation

The Plaintiffs contend that the Debtor committed defalcation by knowingly (1) issuing checks aggregating $30,910.00 on PMI's account made payable to "cash" without properly accounting for those funds; (2) issuing a $25,000.00 check to Legacy Paving without accounting for such funds; and (3) receiving the T & B Limited and T & B Limited Partnership checks totaling $30,000.00 without depositing such checks into PMI's checking account or otherwise accounting for those funds.

"Defalcation" is not a defined term in the Bankruptcy Code. One court has defined defalcation within the context of § 523(a)(4) as "the misappropriation of trust funds held in any fiduciary capacity, and the failure to properly account for such funds." *Strube Celery & Vegetable Co. v. Zois (In re Zois)*, 201 B.R. 501, 506 (Bankr. N.D. Ill. 1996) (internal

-15-

quotation omitted). *See also Blackhawk B.M.X., Inc. v. Anderson (In re Anderson)*, 64 B.R. 331, 334 (Bankr. N.D. Ill. 1986). An objective standard is used to determine a defalcation, and intent or bad faith is not required. *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 389 (Bankr. N.D. Ill. 1994). Mere negligence does not constitute defalcation. *Meyer v. Rigdon*, 36 F.3d 1375, 1384-85 (7th Cir. 1994) (construing "defalcation" under § 523(a)(4) and § 523(a)(11)). That is, although the Seventh Circuit has not clearly defined the level of tortious conduct necessary to constitute a defalcation in the context of § 523(a)(4), it has required something more than mere negligence or mistake, but less than fraud. *Id.* at 1385; *Kress v. Kusmierek (In re Kusmierek)*, 224 B.R. 651, 656-57 (Bankr. N.D. Ill. 1998). Some degree of culpability is required to make a debt non-dischargeable as a defalcation under § 523(a)(4), *see Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir. 1937), and a debtor's knowledge is relevant, *see Chase Lumber & Fuel Co. v. Koch (In re Koch)*, 197 B.R. 654, 658-59 (Bankr. W.D. Wis. 1996). In sum, in order to establish that a debt is non-dischargeable for reason of defalcation while acting in a fiduciary capacity, the Plaintiffs must establish, by a preponderance of the evidence, the existence of an express trust or fiduciary relation and a debt caused by the Debtor's defalcation while acting as a fiduciary. *See Grogan*, 498 U.S. at 291; *Woldman*, 92 F.3d at 547.

The Court finds that the Plaintiffs have demonstrated by a preponderance of the evidence that the Debtor's above referenced actions with respect to the subject checks constitute defalcation. As discussed *supra*, the Plaintiffs proved the existence of a pre-existing fiduciary duty owed to PMI only, not Murray, as required under § 523(a)(4).

·16·

Turning to the transactions themselves, Murray testified that the Debtor never told him the purpose of the checks made payable to "cash." Trial Tr. at 74-75. In contrast, the Debtor testified that it was possible that these checks were drafted with the purpose of procuring cashier's checks to pay vendors or procuring cash to pay PMI's employees per the procedure that the Debtor and Murray followed when PMI's checks were returned by MB Financial for insufficient funds. *Id.* at 110-114. The Debtor, however, did not make any notations on the various checks to account for the funds, nor was he able to produce any corroborating documentation, such as receipts or paid invoices, to show who allegedly received the funds. The Debtor testified that any documentation would have been sent to PMI's offices and that he did not have access to PMI's financial records. *Id.* at 113-116. The Debtor also testified that, in reviewing PMI's bank statements, he had identified 62 checks issued by PMI in 2002 that had been dishonored by MB Financial as a result of insufficient funds in PMI's account. *Id.* at 116. However, the Debtor stipulated that none of the amounts on the dishonored checks matched the amounts on the $30,910.00 in checks he made payable to "cash." *Id.* at 122.

The Court finds that the Debtor's speculation regarding the possible purpose of the checks made payable to "cash" does not constitute evidence that he properly accounted to PMI for those funds as he was required to do as one of the company's officers and directors. Accordingly, the Court finds that the Debtor failed to properly account for the $30,910.00 in checks he made payable to "cash." Thus, the Court concludes that the Debtor's actions constitute defalcation regarding the $30,910.00 in checks written from PMI's account.

Next, with respect to the $25,000.00 check made payable to "Legacy Paving" from PMI's account, Murray testified that PMI did not borrow money from Tony Sanchez. *Id.* at

-17-

73-74. Specifically, Murray testified that he and the Debtor discussed the issue of Tony Sanchez loaning money to PMI and that Murray did not feel comfortable having Sanchez loan money directly to PMI. *Id.* Murray testified that the Debtor decided to personally borrow the money from Sanchez and put it into PMI just as Murray had borrowed money from his parents and put that money into the company. *Id.* at 74. Murray concluded that any money from Sanchez would have been borrowed by the Debtor personally and not on behalf of PMI. *Id.* at 74 and 88.

The Debtor, however, testified to the contrary. He stated that Tony Sanchez loaned PMI $50,000.00. *Id.* at 31 and 117. Further, the Debtor testified that the $25,000.00 check from PMI to Legacy Paving was a partial repayment of that loan. *Id.* According to the Debtor, he discussed this $25,000.00 payment to Legacy Paving with Murray. *Id.* at 117. Thus, the testimony with respect to the purpose of the Legacy Paving check is conflicting.

The Court finds Murray's testimony more credible on this point, as well as more detailed and specific, than the testimony of the Debtor. The Court is in the best position to assess the credibility of the witnesses and to weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that involve the credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dep't of Health & Soc. Servs.*, 838 F.2d 944, 946 (7th Cir.1988) (*citing Anderson*).

The documentary evidence regarding whether Tony Sanchez made the loan to PMI or to the Debtor personally is also in conflict. That the check from Legacy Paving was made

-18-

payable to "PMI," was endorsed by Murray on behalf of PMI, and was deposited into PMI's account all support the Debtor's testimony that PMI borrowed the money. Debtor's Ex. A. However, the memo portion of that check references "Loan - Joe," thereby supporting Murray's testimony that the Debtor personally borrowed the money from Tony Sanchez. *Id.* There is no other documentary evidence in the record to clarify whether the loan from Tony Sanchez was made to the Debtor or to PMI. No promissory note or similar evidence was adduced.

Based upon the evidence, the Court is unable to ascertain the nature of the relationship between Tony Sanchez and Legacy Paving. Accordingly, the Court cannot determine with certainty whether the Legacy Paving check was issued to repay Tony Sanchez for the loan he made to either PMI or the Debtor. Nevertheless, the Court finds that, based on Murray's testimony, the Debtor utilized PMI's funds to pay his personal debt. A corporate officer's use of corporate funds to pay a personal debt is a breach of his fiduciary duty to the corporation absent proper prior approval of the corporation, which is not the case in the matter at bar. *See TMF Tool*, 899 F.2d at 589. Hence, the Court concludes that the Debtor's actions with respect to the $25,000.00 check to Legacy Paving constitute defalcation.

Finally, with respect to the two checks made " PMI" from T & B Limited and T & B Limited Partnership, Murray testified that these checks were never deposited into PMI's checking account. Trial Tr. at 76 and 79-80. The Debtor testified at trial that he was not certain whether he received these checks, and he could not recall specifically what the checks were for. *Id.* at 35-41. At his prior deposition, however, the Debtor stated that these checks were a personal loan to him from Taden, and he admitted receiving the checks. *Id.* at 36-37.

-19-

The Debtor attempted to rehabilitate his conflicting statements by contending that he received another check from Tadin in December 2002, not the two checks at issue. *Id.* at 37. According to the Debtor, he received the other check as a personal loan from Tadin. *Id.* at 37 and 118. However, the Debtor never produced the other check he allegedly found. Thus, the Court finds that the Debtor's testimony on this point was impeached and is, therefore, incredible.

Murray testified, on the other hand, that MAT, one of the companies owned by Tadin, owed PMI approximately $236,000.00 at the end of PMI's 2002 season. *Id.* at 76 and 79. Murray further testified that the two T & B checks were sent to PMI to pay down a receivable owed by MAT to PMI. *Id.* at 77. According to Murray, the Debtor attempted to collect this specific receivable at the end of 2002. *Id.* at 79. The Debtor told Murray that he had, in fact, collected a portion of the MAT receivable. *Id.*

The Court finds that the preponderance of the documentary and testimonial evidence demonstrates that the Debtor received the two $15,000.00 checks from T & B Limited and T & B Limited Partnership and that he failed to deposit such checks into PMI's account. As such, the Debtor misappropriated those checks that he held in his fiduciary capacity as an officer and director of PMI. In addition, the Debtor failed to account for those checks. Accordingly, the Court finds that the Debtor's actions constitute defalcation.

As for the Debtor's affirmative defenses noted *supra*, the Court finds that those defenses are insufficient to defeat a cause of action under § 523(a)(4). The Debtor has the burden of proving his affirmative defenses. He failed to support these defenses with any evidence or case authority. Perfunctory and undeveloped arguments and arguments that are

-20·

unsupported by pertinent authority are waived. *United States v. Lanzotti*, 205 F.3d 951, 957

(7th Cir.) (collecting cases), *cert. denied*, 530 U.S. 1277 (2000). The Court does not have a

duty to research and construct legal arguments available to a party. *See Head Start Family*

*Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995).

Moreover, a litigant who fails to support a request with pertinent authority forfeits that

request. *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1991).

More importantly, the Court finds that it is impossible for the Debtor to prove a set of

facts in support of his affirmative defenses that would defeat the Plaintiffs' § 523(a)(4) cause

of action. Murray's involvement with Chicago Wicker and his repayment of loans made to

PMI by Chicago Wicker are immaterial and do not serve to insulate the Debtor from his

defalcations with respect to PMI. Furthermore, that the Debtor and Murray assigned PMI's

receivables to Tony Sanchez in repayment of his loan does not serve as a defense. Thus, the

Debtor's two affirmative defenses are legally insufficient.

In conclusion, the Plaintiffs showed that the Debtor misappropriated or failed to

account for some of PMI's funds. As detailed above, the Debtor wrote PMI checks in the

amount of $30,910.00 made payable to "cash"; drafted a PMI check to Legacy Paving in the

sum of $25,000.00, an amount that PMI did not owe Legacy Paving; and failed to deposit the

T & B Limited and T & B Limited Partnership checks totaling $30,000.00 into PMI's account.

All of these checks total $85,910.00. In sum, the Court finds that the Debtor failed to account

for a total of $85,910.00 of PMI's funds in violation of his fiduciary duty to PMI as one of its

officers and directors. As a result, the Court finds that this debt is non-dischargeable under

§ 523(a)(4). The Court enters judgment in favor of PMI in the sum of $85,910.00.

-21-

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court grants judgment in favor of PMI in the sum of $85,910.00 and finds that the debt is non-dischargeable pursuant to § 523(a)(4).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED:**

DATE: ___11/15/5___

_____
John H. Squires
United States Bankruptcy Judge

cc: See attached Service List

## SERVICE LIST

### Pavement Maintenance, Inc. and Murray v. Haughey

**Adversary No. 04 A 02264**

Ira Bodenstein
United States Trustee
227 West Monroe Street
Suite 3350
Chicago, IL 60606

Paul C. Sheils, Esq.
110 W. Burlington Avenue
LaGrange, IL 60525

Lawrence R. Minor, Esq.
Belofsky & Belofsky, P.C.
33 N. Dearborn Street, Suite 2330
Chicago, IL 60602

Joseph A. Baldi, Esq.
Joseph Baldi & Associates
19 S. LaSalle Street, Suite 1500
Chicago, IL 60603